UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
JOSEPH JAMES,

                          Plaintiff,

      -against-

ANGEL MELENDEZ, MICHAEL CRONIN, and
ROBERT HANRATTY,

                         Defendants.
-------------------------------------------------------------- x

**OPINION AND ORDER DENYING MOTIONS FOR JUDGMENT AND A NEW TRIAL**

05 Civ. 5252 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff Joseph James filed a complaint against Sergeants Melendez, Cronin and Hanratty alleging violations of his civil rights by falsely arresting and maliciously prosecuting him without probable cause, causing him damage. The case proceeded to a six day jury trial, at the end of which the seven-person jury delivered a unanimous verdict for the defendants. Plaintiff now moves, pursuant to Rules 50(b) and 59, Fed. R. Civ. P., for judgment notwithstanding the verdict and for a new trial. The motion is denied.

      **Standards for Rule 50(b) and Rule 59**

      A Rule 50 judgment as a matter of law is appropriate only where "there is no legally sufficient evidentiary basis" for a reasonable jury to find for a party on a given issue. Fed. R. Civ. P. 50; Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998). A party seeking a motion for judgment as a matter of law after a jury verdict faces a "high bar". Lavin-McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001). A court must construe the evidence in the light most favorable to the party opposing the motion, and give deference to the credibility determinations and reasonable inferences of the jury. A court may not itself make credibility determinations or decide the weight of the evidence. DiSanto v.

1

McGraw-Hill Inc./Platt's Div., 220 F.3d 61, 64 (2d Cir. 2000). Judgment as a matter of law will not be granted unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against [the movant]." Mallis v. Bankers Trust Co., 717 F.2d 683, 688-89 (2d Cir. 1983) (citations omitted).

The standard for granting a new trial pursuant to Rule 59 is somewhat less exacting than the standard for granting judgment as a matter of law pursuant to Rule 50(b). Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). A court may order a new trial even if substantial evidence supports the jury verdict, and the court is free to weigh the evidence for itself and need not view the evidence in the light most favorable to the non-moving party. Id. at 244-45. Still, "[t]he district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice". Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988).

**Discussion**

Plaintiff assigns three grounds of alleged error: (1) the Police Officers' testimony was not credible; (2) juror misconduct; and (3) attorney misconduct in relation to discovery obligations.

1. The Credibility of the Police Officers

Plaintiff seeks judgment as a matter of law pursuant to Rule 50(b) against Defendant Hanratty on both the false arrest and malicious prosecution counts. Police Officer Hanratty testified that he stopped plaintiff as plaintiff and his brother walked from Jackie Robinson Park. Hanratty found a small scale in plaintiff's inside pocket similar to those used by

2

narcotics dealers, saw what he thought was a residue of narcotics, and arrested him in the reasonable belief that he had trespassed in a residential building watched by an undercover detective located at 321 Edgecombe Avenue, a "clean halls" building. Various apartments in the building had been taken over by narcotics gangs, causing the landlord to enter into an agreement with the Manhattan District Attorney's Office that authorized the police to arrest visitors who had no proper reason to be there, and the police had the building on their watch list because it was the locus of considerable drug trafficking.

An undercover agent had placed himself outside the building in his car, watched someone he later identified as the plaintiff walk in and out of the building seemingly to make a purchase, escorted by another person whom he knew to be a "stearer" for drug purchases, and then walk in the direction of Officer Hanratty's post around the corner, meanwhile giving "play by play" descriptions to Officer Hanratty. Based on the "play by play" descriptions and the path taken by the person watched by the undercover and coming into the view of Officer Hanratty, Hanratty stopped the plaintiff, searched him and arrested him.

Plaintiff challenges the existence of the undercover at the scene, and his testimony regarding what he saw and what he described. Despite discrepancies, the jury was entitled to believe both witnesses, the Undercover Officer and Officer Hanratty, and that it was the plaintiff whom the undercover described and whom Hanratty arrested.

The jury also reasonably could have had questions about plaintiff's testimony. Plaintiff testified that he left his apartment located at 300 West 150th Street with his 12-year old brother, heading through the park to escort his brother to his grandmother's apartment at 155th Street and Amsterdam Avenue, a walk through the park and the adjacent streets of approximately 15 minutes. Plaintiff testified that he stopped to urinate behind a bush in the park (apparently, he

3

neglected to do so before he left his apartment, and he couldn't wait until he reached his grandmother's apartment), found the small scale and, thinking it had some value, put it in his pocket. He admitted it was a "big mistake." He testified that he left the park, that he did not walk in the direction of the building being watched by the undercover but directly to his grandmother's house, that the undercover could not have seen him because he did not walk in the direction of the apartment building but in the opposite direction, and that he was stopped without reason by Officer Hanratty en route to his grandmother's house.

The test for a stop is reasonable suspicion. United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). The reasonable suspicion can be of any crime that the officer reasonably suspects was committed by the person who was stopped. See United States v. Sokolow, 490 U.S. 1, 7 (1989). Once there is a reasonable basis to stop, the officer is entitled to ask basic questions and search the person, primarily for self-protection. United States v. Stewart, 491 F. Supp. 2d 423, 427 (S.D.N.Y. 2007). It does not matter whether or not the person who is stopped actually committed the crime of which the officer had suspicion or, if the person is arrested and later charged, the arrest and the charge are for different crimes. Cf. Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006) (noting that plaintiff's subsequent acquittal is not determinative of whether reasonable suspicion existed at the time of the stop).

Obviously, the jury believed the two police officers, and that the test of reasonable suspicion was satisfied. This is so regardless whether they also may have believed the plaintiff, for the test is not whether or not the police officers were correct, only that Hanratty's suspicion was reasonable in the circumstances. The jury also could have disbelieved the plaintiff's testimony, while crediting the testimony of the police officers. As a general

4

matter, a trial court cannot disturb a jury's credibility determinations with regard to witness testimony unless the verdict is egregious. DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). Because there can be no argument that the jury verdict in this case was egregious, there is no basis for questioning the jury determinations made with regard to the credibility of Defendant Hanratty and that of the plaintiff. In light of the exacting standard set forth above for granting a judgment as a matter of law after a jury verdict, and the fact that I cannot say that there is no legally sufficient basis upon which a reasonable jury could find for the defendants, I deny plaintiff's Rule 50(b) motion with regard to Defendant Hanratty.

Plaintiff also challenges the credibility of Officers Cronin and Melendez, and seeks a new trial on the merits against them pursuant to Rule 59 with regard to the false arrest and malicious prosecution claims. Cronin testified that he was in charge of transporting the six persons arrested that afternoon and early evening to the precinct house. He described how he handcuffed each person who was detained, where each sat, how he saw a bag of crack on the seat where plaintiff had been seated, how the handcuffs allowed a person to have access to his back pockets, and how the small crumpled bag containing crack could not have belonged to anyone other than plaintiff. The jury's verdict was reasonably supported by Officer Cronin's credible testimony.

Finally, plaintiff challenges the testimony of Officer Melendez. Officer Melendez was in charge of the team of officers who were involved in plaintiff's arrest. Officer Melendez testified as to the procedures in effect at the precinct house, and how he double-checked the identity of plaintiff by having the undercover agent view the six persons arrested as they stood on the sidewalk outside the precinct house, in line, after they were removed from the transport van. The jury's verdict was reasonably supported by Officer Melendez's credible testimony. Plaintiff

5

concedes that the jury was properly instructed as to the legal standards they should apply and as to the manner of judging credibility. Even after judging the credibility of witnesses and weighing the evidence independently of the jury verdict, as I am permitted to do on a Rule 59 motion, I do not find that the jury verdict is erroneous, let alone seriously erroneous, or constitutes a miscarriage of justice. Accordingly, I deny plaintiff's Rule 59 motion for a new trial against Defendants Melendez and Cronin.

2. The Juror's Alleged Misconduct

Plaintiff next argues that one juror failed to disclose essential facts about himself in answer to questions, and that this failure corrupted the verdict and requires a new trial. The argument is without merit.

The jury was to be of eight persons. R. 48, Fed. R. Civ. P. ("The court shall seat a jury of not fewer than six and not more than twelve members and all jurors shall participate in the verdict unless excused from service by the court pursuant to Rule 47(c).") Fourteen jurors were called and sworn, enough to seat eight and allow each side three peremptory challenges. The juror in question was seated in the number seven seat. In answer to questions, mostly at the side-bar and out of the hearing of the other jurors, the juror answered that he was a lawyer, that he practiced in Yonkers with a named firm, that he practiced civil litigation, primarily insurance defense, and that he and other lawyers of the firm defended the City of Yonkers in litigation. He described generally several of the cases in which he had appeared, stated that he thought that he or other members of the firm may have been co-counsel with lawyers of the New York City Corporation Counsel, but that he did not know the lawyers who represented the defendants, although he recognized them as lawyers with the Corporation Counsel. He represented that he does not practice civil rights litigation. He stated, also, that his nephew was a New York City

6

policeman. He stated that he would judge the issues fairly and impartially, notwithstanding his representations of the City of Yonkers.

Plaintiff asked that I ask him additional questions about any relationship with New York City "from a legal point of view." I declined to ask such questions, ruling that the juror had stated as much as he said he had remembered, and that plaintiff's suggested questioning was repetitive. I already had asked the questions that plaintiff requested that I ask, and I was concerned that further questioning could anger the juror and endanger the juror's neutrality. I asked the juror again if he would be neutral and impartial, and call the case as the merits dictated and in accordance with my instructions. The juror affirmed that he would do so. I denied plaintiff's challenge for cause.

Plaintiff exercised each of his three peremptory challenges, challenging (1) a married female resident of Westchester with a graduate degree in business who volunteers at the board of education and whose husband is a lawyer, (2) a retired widower living in Putnam County who previously served as a letter carrier with the postal service in Yonkers, New York; and (3) a single female Westchester County resident who works at a commercial real estate company in Connecticut. The juror who was in the seventh seat was not challenged, and became juror number four.

On the morning of the first full day of trial, juror number 3 asked to be excused, citing various hardships that she had mentioned but had not fully appreciated during voir dire questioning. Both sides asked me to excuse her, and I did so, reducing the jury size to seven. The remaining jurors kept their seats.

On the fifth day of trial, after the defense rested and just prior to summations, plaintiff represented that a Lexis check showed that the juror now being challenged (juror

number 4) in fact had represented the City of Yonkers in a false imprisonment case, and that a partner of his firm had represented New York City in a lawsuit.  I reviewed the cases, these two and a number of others, and observed that the jurors' involvements mostly reflected defenses of a Westchester hospital, and that one or two cases involved suits by prisoners alleging medical malpractice and, alternatively, medical indifference.

I questioned the juror in the robing room, in the presence of counsel, before beginning that day's session, and elicited that the juror's practice concentrated on medical malpractice defense.  He acknowledged that medical indifference claims may have been alleged, but stated that he considered the gravamen of the actions as malpractice claims alleging negligence, and not constitutional claims of medical indifference.  I asked him to observe that the associates and partners of his firm listed their practice specialties in Martindale-Hubbel as "Municipal Defense/Civil Rights".  The juror responded that one lawyer in his firm handled police brutality cases against Yonkers policemen, and that he did not work on those cases.  The juror stated that he was an associate of the firm since 2001, was not aware of the civil rights listings, and represented that the firm's specialty was defense of negligence and malpractice claims, particularly against Westchester municipalities, and that he was not familiar with any civil rights work.  As for the case involving an allegation of false arrest, he said that he lacked specific recollection, but added that he often answered calendar calls for others and believed that the case shown to him was such a case.  Again, I asked the juror if he would be fair and impartial, and he said that he would.  Plaintiff had no further questions for me to ask and, after the juror left the robbing room to return to the jury room, again challenged the juror for cause.  I denied the motion.

Later in the trial, while the jury was deliberating, plaintiff brought to my attention a reported case in which a retired New York City policeman with the same last name as juror number 4 had been sued for false arrest. Juror number 4 had disclosed during voir dire that he had a nephew on the New York Police force who worked primarily in the Bronx, and plaintiff had not asked me to question juror number 4 further on the possible significance of his nephew's status and activities as a police officer. Now plaintiff said, according to his research, there were three police officers in the New York Police Department with the same last name, one of whom plaintiff surmised was juror number 4's nephew. The retired police officer who had been sued was also among the three officers with the same last name.

Plaintiff, stating "I'm assuming that this is not a relative of this juror, but I certainly don't know and I certainly cannot let this go without further inquiry", requested that I ask Corporation Counsel to make a representation about the relationship between the police officers and the juror, and that I further question juror number 4 if Corporation Counsel had no information. Corporation Counsel stated upon questioning that they had no available information regarding the relationship between the police officers and juror number 4, and as a result, plaintiff requested that I further question juror number 4. I denied the request, ruling that it would be improper, without much stronger reason, for the court to disrupt jury deliberations to conduct a voir dire of a juror. I commented that plaintiff could not use regrets for failing to ask me to question further earlier in the case, or to exercise peremptory challenges wisely as reasons for continuing voir dire. I stated that I would consider a request to further examine juror number 4 after the verdict was delivered. Plaintiff declined to make such a request after the verdict. And in any event, it is not appropriate, once a jury verdict has been delivered, to impugn that verdict by questioning one of the jurors.

Now plaintiff, having neglected to challenge the jury peremptorily, contends that I erred in not granting plaintiff's challenge for cause, and in not asking more follow-up questions. Plaintiff's motion for a new trial is denied.

Trial judges are granted broad discretion in deciding how to conduct voir dire, including the appropriate questions to be asked. Mu'Min v. Virginia, 500 U.S. 415, 423 (1991) (citation omitted); Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981). Litigants do not have a right to have particular questions asked of the jury. Ham v. South Carolina, 409 U.S. 524, 527 (1973). Furthermore, the trial court has broad discretion in deciding challenges by the parties for bias when empanelling the jury. United States v. Haynes, 398 F.2d 980, 984 (2d Cir. 1968). A finding of juror bias is "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province". Wainwright v. Writ, 469 U.S. 412, 428 (1985).

I questioned juror number 4 extensively, first during the initial voir dire, and later in the robbing room in response to plaintiff's request. I found juror number 4 to be open and honest in all dealings with the Court, and I believe he answered the questions asked of him to the best of his ability. Plaintiff's belated challenge after voir dire and not until jury deliberations regarding individuals in the New York Police Department with the same last name is speculative and insufficient to undo the verdict resulting from a six-day trial. Most importantly, in answer to multiple questions if he could be fair and impartial, juror number 4 assured the Court that he could be. I found his assurances to be credible. Equally important, once the jury verdict had been delivered, it is inappropriate to question a juror about something that could have been explored during voir dire but which the lawyers did not press, and where absolutely no prejudice has been shown. Cf. Fritz v. Boland & Cornelius, 287 F.2d 84, 86 (2d Cir. 1961) (refusing to upset jury verdict where after the verdict was delivered, it was discovered that plaintiff and juror

suffered from similar injury; defendant failed to question the juror whether injury existed during voir dire, and defendant showed no evidence of prejudice). I deny plaintiff's motion for a new trial on this basis.

Plaintiff also asks in his motion papers that I direct Corporation Counsel to investigate further any potential relationship between juror number 4 and the retired New York police officer. Plaintiff asked for such relief during jury deliberations, and I directed Plaintiff to put this request in writing. Plaintiff declined to do so until the filing of this motion. If this request might have been reasonable at some point, it is well past the time that I could consider it so. Plaintiff did not find it necessary to probe more deeply into any juror's relationship with the New York Police Department during voir dire, and, as stated above, Plaintiff has failed to show that the failure of further questioning of juror number 4 has prejudiced him in any way. As a result, I deny Plaintiff's request.

3. Discovery misconduct

During pre-trial proceedings, plaintiff demanded production of all cell phone records for the cell phones used by the undercover police officer and the other police officers on the team. The issue was relevant because pre-trial discovery showed that an undercover officer, although not part of the tactical plan for the day in issue, became available later in the day, communicated his presence by cell phone with the team leader, took his look-out position, and communicated descriptions to other members of the team that made up the justification for Officer Hanratty's stop, search and arrest. Cell phone communications between Officer Melendez and the undercover also arranged the appointment for the undercover officer to come by the precinct house and identify the plaintiff and five others who had been detained and were lined-up before the precinct house.

During pretrial proceedings, in response to discovery demands by plaintiff, counsel for the defendants reported that she had checked the cell phone records identified by the defendants to the extent that she was able to get access to those records, and no reference to a cell phone call appeared. I ruled, in place of further depositions by plaintiff of already-deposed witnesses, that plaintiff would be precluded from offering testimony of cell phone communications.

A few days before trial began, counsel for the defendants reported that her further investigations and preparations showed that the officers' cell phones had Nextel Direct Connect capability. She represented that, by pressing a button on the cell phone, cell phone contact could be made between identified parties on the same network, and that such calls were not billed by Nextel nor reflected on any record. She reported that the undercover also communicated with other members of the team by police-issued radios, and that the communications were not captured on any record. During trial, I ordered defendants to produce records showing that the cell phones in issue had Nextel capability. Defendants' counsel reported, after investigation, that no records were currently available.

During trial, Sergeant MacDonnell testified that he had communicated with the undercover, learned of his availability, and ordered his participation, not by a police-issued cell phone, but by his private cell phone, and he had not disclosed that cell phone or its records to his counsel.

I held several hearings concerning this issue, finding as follows:

a. Defendants' counsel did not intentionally mislead the court or opposing counsel. She reported the facts as she knew them and as her clients represented them to her.

b. Whether or not there were Nextel communications between the undercover and team members was an issue of credibility that the jury should decide. It would be wrong for the court to punish a discovery abuse that essentially was non-willful in such a manner as to affect the merits and preclude relevant testimony from being presented to the jury.

c. Since no records captured point-to-point communications by Nextel cell phones or police radio, defendants' failure to make production did not prejudice plaintiff. There were no records that could have existed which plaintiff could have used to impeach the testimony of the police officers.

d. Nevertheless, defendants' failures timely to apprise plaintiff of the true state of the police officers' knowledge could and should be considered by the jury on the issue of the credibility of defendants' assertions, both that there was an undercover, and that Officer Hanratty reasonably relied on the descriptions communicated by the undercover. Consequently, I invited the parties to recommend a relevant jury instruction.

e. I considered the instruction recommended by plaintiff as too harsh and manipulative of the jury's fair evaluation of the merits. I prepared an instruction relevant to evaluating credibility and, after vetting it with counsel, read it to the jury:

> Another measure of credibility is matching testimony with objective evidence. We call it often objective evidence or corroborating evidence. And we had this argument with regard to telephone calls on a Nextel phone, calls between one part of the police team and another.
>
> Now, we know that in cell phone use there is a record of the call being made and of the call being received. But we are told that with point-to-point calling on a radio or a Nextel phone, there is no evidence of particular calls made or received. The attorneys pursue this information in discovery in the long phase before the

> trial begins when they are entitled to take pretrial depositions and they ask various questions of one another and the system requires proper and honest disclosure and full disclosure by one party to another. If that doesn't occur, the jury has a right to consider it in determining the credibility of a particular issue.
>
> You have heard testimony in this case regarding communications between Undercover Officer 110 and Sgt. MacDonnell using the direct connect features on the Nextel cellular phones and on point-to-point radios between Undercover Officer 110 and other members of the field team. Nextel does not create a record of individual communications that are made using this direct connect feature. And there are also no such records at point-to-point radio.
>
> However, in response to requests for information, records could have been provided, but were not provided by the Defendants, showing that both Sgt. MacDonnell and Undercover Officer 110, in fact, had direct connect capability on their cellular phones. They said they had, but objective confirmation of that could not have been made because the proper disclosure was not made by the defendants in pretrial discovery. You may consider that failure in determining what weight, if any, to give the testimony that communications were, in fact, had between Sgt. MacDonnell to Undercover Officer 110.
>
> Now, for all of this, and I'll give you a few more, what you must try to decide, what you must try to do in deciding credibility, is to size up a person in light of demeanor, explanations, other evidence in the case, corroboration, all these things that you do in deciding if something of importance that's told to you by another is true or not. And you apply your judgments, your experience, your logic, your common sense.

Plaintiff is dissatisfied with the instruction, and now seeks a new trial based on the testimony offered regarding communication between the officers using the Direct Connect feature. A new trial based on the production of cell phone records is not warranted. In support of its argument that a new trial is appropriate for the alleged discovery violation, plaintiff cites a single unpublished case from the Southern District of New York. However, in the case cited, Health Care Alliance Network, Inc. v. Cont'l Cas. Co., 245 F.R.D. 121, 128-29 (S.D.N.Y. 2007),

the Court held that a new trial was not an appropriate remedy for the alleged discovery violation. Far from supporting plaintiff's argument, the Court in Health Care Alliance noted that the sanction of granting a new trial in response to a discovery violation is a "drastic" penalty, only appropriate in "extreme" circumstances, where a showing of willfulness or bad faith and prejudice are necessary in imposing such a severe penalty.

I previously ruled that the discovery issue was not a product of intentional misleading of opposing counsel or the court. I found, in light of the circumstances, that the most appropriate remedy for the violation was a proper instruction to the jury, permitting it to evaluate the failure of defendants to make appropriate and timely discovery. Plaintiff cannot legitimately claim that he suffered prejudice. A new trial pursuant to Rule 59 is not warranted.

**Conclusion**

For the foregoing reasons, I deny plaintiff's motions for judgment as a matter of pursuant to Rule 50(b) and for a new trial pursuant to Rule 59. The Clerk shall mark the case closed.

SO ORDERED.
Dated:  June 16, 2008
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge